**Opinion issued September 29, 2022**



**In The**

# Court of Appeals

**For The**

# First District of Texas

_____

## NO. 01-22-00283-CV

_____

## IN THE INTEREST OF J.C.K.H. A/K/A/ J.H., A CHILD

---

**On Appeal from the 314th District Court**
**Harris County, Texas**
**Trial Court Case No. 2020-01659J**

---

## MEMORANDUM OPINION

In this accelerated appeal,[1] appellant, Mother, challenges the trial court's

order terminating her parental rights to her minor child, J.C.K.H. a/k/a J.H.,[2] and

---

[1]    *See* TEX. FAM. CODE § 263.405(a); TEX. R. APP. P. 28.4.

[2]    For purposes of this opinion, we refer to the child as J.H. or "the child."

awarding the Department of Family and Protective Services ("DFPS") sole managing conservatorship of the child. In five issues, Mother contends that the trial court erred in appointing DFPS as the sole managing conservator of the child and that the evidence is legally and factually insufficient to support the trial court's findings that she (1) engaged, or knowingly placed the child with persons who engaged, in conduct that endangered the child's physical and emotional well-being;[3] (2) constructively abandoned the child, who had been placed in the permanent or temporary managing conservatorship of DFPS for not less than six months;[4] or (3) failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of the child.[5] She also contends that there is legally and factually insufficient evidence to support the court's finding that termination of her parental rights is in the best interest of the child.[6]

## BACKGROUND

Two days after J.H. was born, DFPS received a report alleging neglectful supervision by Mother. Mother "had a manic episode when she was delivering the child," and "did not have anybody else . . . as a possible placement for the child[.]"

---

[3]     TEX. FAM. CODE § 161.001(b)(1)(E)

[4]     *Id.* § 161.001(b)(1)(N).

[5]     *Id.* § 161.001(b)(1)(O).

[6]     *Id.* § 161.001(b)(2).

2

Mother underwent a psychiatric evaluation, and the hospital recommended that that she receive inpatient psychiatric treatment. However, Mother was not committed for involuntary psychiatric treatment, but was discharged on August 14, 2020. The child remained in the hospital; he had been suffering from shaking bouts even though Mother's urinalysis was negative for illegal drugs. He was also on a feeding tube and was not eating as much as he should.

On August 12, 2020, while the child was still in the hospital, DFPS filed an Original Petition for Protection of a Child for Conservatorship and for Termination in Suit Affecting the Parent-Child Relationship. On August 20, 2020, DFPS filed an amended petition, and the trial court signed an emergency order appointing DFPS as the child's Temporary Managing Conservator that same day. Soon thereafter, the child was placed with a foster family.

### *Criminal History*

Mother's Criminal history includes:

| | | |
|---|---|---|
| 11/10/14 | Assault-Bodily Injury | 10 days' confinement |
| 10/31/15 | Assault-Bodily Injury | 60 days' confinement |
| 06/10/17 | Att. Harassment of a Public Servant | 180 days' confinement |
| 07/17/18 | Assault-Family Member | 30 days' confinement |

Additionally, at the time of the child's birth, Mother had a pending felony indictment for making a terroristic threat against a judge. Though the record is

3

unclear, at some point after the child was born, Mother was jailed in connection with this charge, and she was released on bond in February 2021.

*Prior DFPS Involvement*

The record shows the following regarding Mother's history with DFPS:

10/16/13    DFPS received a referral for negligent supervision of four minor children. The allegations, for which DFPS determined there was "Reason to Believe" were that Mother was using drugs while caring for the children; that she was being evicted and had nowhere to go. Mother was "feeling overwhelmed and wants to turn [the four children] over to the state until she can get on her feet." The children were removed from Mother's care.

11/06/13    DFPS received a referral for negligent supervision of two of the four children named in the prior referral. The allegations were that mother attempted to commit suicide in front of the children. She also left the two children at school without making any arrangements to pick them up. The two children were removed from Mother's care.

The four children were removed from Mother's care and placed in foster care.

As of the time of trial in this case, Mother's parental rights had been terminated as to these four children.

*Drug Use*

Regarding random drug testing, Mother's Family Service Plan provides:

[Mother] will submit to random drug screenings within 24 hours of the Department's request. In the event that [Mother] fails to attend a screening or if the spectrum returns as altered or diluted the drug screening will automatically be considered positive. [Mother] shall provide legitimate and verifiable documentation of the parent's inability to participate in any drug screening. [DFPS] is responsible for paying for this service. DFPS will provide, in accordance with the Americans with Disabilities Act, reasonable accommodations to assist

4

[Mother] in completing her service plan tasks in efforts to reunify the family.

Thereafter, Mother had the following positive drug screenings:

| | | | |
|---|---|---|---:|
| 05/04/21 | Positive for | Methamphetamine (urine) | >10,000 ng/mL |
| | | Amphetamine (urine) | 4,013 ng/mL |
| 06/09/21 | Positive for | Methamphetamine (hair) | 24,471 pg/mg |
| | | Amphetamine (hair) | 1,028 pg/mg |
| | | Cocaine (hair) | 9,730 pg/mg |
| | | Benzoylecgonine (hair) | 1,995 pg/mg |
| 08/26/21 | Positive for | Methamphetamine (hair) | 45,932 pg/mg |
| | | Amphetamine (hair) | 2,325 pg/mg |
| | | Cocaine (hair) | 7,286 pg/mg |
| | | Benzoylecgonine (hair) | 1,522 pg/mg |
| 11/02/21 | Positive for | Methamphetamine (urine) | > 10,000 ng/mL |
| | | Amphetamine (urine) | 2,404 ng/mL |
| | | Methamphetamine (hair) | 95,128 pg/mg |
| | | Amphetamine (hair) | 5,620 pg/mg |
| | | Cocaine (hair) | 14,487 pg/mg |
| | | Benzoylecgonine (hair) | 4,510 pg/mg |
| 12/21/21 | Positive for | Methamphetamine (urine) | >10,000 ng/mL |
| | | Amphetamine (urine) | 3,046 ng/mL |

In addition, the record shows that, between March 2021 and February 2022, Mother failed to participate in drug testing at least 14 times.

*Trial*

On February 8 and March 8, 2022, the trial court held a trial on the merits of DFPS's petition to terminate Mother's parental rights.

Lindsey Sanchez, a conservatorship worker for DFPS, testified about the child's current placement. According to Sanchez, the child had been in a foster home

since December 2021. In her opinion, the foster home was meeting the child's current physical and emotional needs, and the foster parents were willing to adopt the child if given the opportunity to do so.

Sanchez explained that Mother had a "manic episode" during the child's birth and had no one else to take the child, which, along with information about Mother's prior removals and terminations, led DFPS to remove the child.

Sanchez testified about efforts to reunite Mother and child through completion of Mother's Family Service Plan. Sanchez testified that, under the plan, Mother was required to "[m]aintain stable housing, verifiable income, parenting classes, individual counseling, substance abuse assessment, also anger management classes and a psychological evaluation and psychiatric evaluation." When asked whether Mother completed her plan, Sanchez stated, "She only completed the substance abuse assessment, but she did not follow the recommendations." Specifically, Mother did not complete her psychosocial, substance abuse individual counseling, substance abuse group counseling, parenting classes, or drug tests.

Regarding housing and employment, Sanchez testified that Mother had not provided DFPS with information regarding her housing or her employment and that the child might be at risk because of Mother's lack of stable housing or income. Mother had represented to the case manager that she was unemployed. There was also evidence that the caseworker had been told by the apartment manager that

6

Mother was facing eviction because of nonpayment. In contrast, Mother claimed that she had lived in the same apartment for several years and that she supported herself by providing hair and nail services in her home. There was evidence that she was in jail for several months during the same period.

Sanchez also testified about Mother's failed drug tests, which are detailed above. She pointed out that, several times, the levels of illegal drugs detected actually increased from one test to the next. In Sanchez's opinion, Mother's repeated drug use was "endangering" because "of how it affects her to be able to prevent [] abuse and neglect" and affects her decision-making ability while the child is in her custody. Sanchez testified that Mother's drug use and pending felony charge create a risk of incarceration, which would leave her unable to provide a safe and stable home environment for the child. Sanchez concluded that termination of Mother's parental rights would be in the child's best interest.

On cross-examination, Sanchez testified that Mother "seemed pretty engaged" with the child during visitation and that her visits seemed to go "pretty well." Sanchez also acknowledged that Mother had begun working on some of her services, such as parenting classes and individual therapy sessions.

Sanchez testified that Mother had told her that "transportation is an issue," which had contributed to her missed visitations and drugs tests. Mother's apartment was several miles from a bus stop, and the bus from that stop ran infrequently. DFPS

offered Mother transportation to her drug tests on three occasions—and at least one and perhaps two times, she refused to get in the car with the case worker.

Mother also testified at trial. She began by offering the trial court information on three murders of which she claimed to have knowledge. She then testified about her drug use, claiming that she did not use methamphetamine or cocaine. Mother also testified that her medical conditions include "bipolar, depression, anxiety, PTSD and ADHD." When asked how she managed those conditions, Mother said, "I do a lot of writing. I do a lot of research." She said that since she "was not given the proper information to do [her] services," she researches them herself online. Mother testified that she was on three medications for her conditions, which she found to be effective.

When asked about her good-faith efforts at drug rehabilitation, Mother testified that her "relapse plan" was to "[g]o to AA meetings and NA meetings," and read her Bible and listen to gospel music, but she also admitted that she had not been to any meetings in "a few years."

Mother testified that she believed that she was bonded with the child "because he recognizes me." She talked about reading to him, singing with him, and bringing gifts to him at visitation.

Regarding other good-faith efforts to complete her family service plan, Mother testified that she tried to get in one location for in-patient services but was

unable to do so. Mother also testified that she and her ad litem attempted to go to an appointment for her psychological assessment, but "[n]o one was there." She testified that she tried to follow up but received no answer, "so that's why I started doing [services] on my own."

The Foster Mother also testified at trial. She said that the child had been in their home since December 2021. The family has two other toddlers that "get along great" with the child and "call him their baby." She testified that the child is a "happy little baby" and that she and her family were bonded with him. They were interested in adopting the child if given the opportunity to do so. According to Foster Mother, the child was meeting all of his developmental milestones and had no special needs.

Finally, Mother's guardian ad litem testified. The ad litem testified about Mother's transportation issues, stating that "[Mother's] not on a bus line and [] does not have the financial means, to get to regular visits." The ad litem testified that Mother "could have benefitted from additional time" to complete her services. She concluded that "[f]or the most part, I'd say that [Mother] made a good effort" to complete her services. In her opinion, however, DFPS could have helped Mother further by tailoring her family service plan to her needs and making accommodations or alternative services available.

*The Trial Court's Order*

At the conclusion of the hearing, the trial court found sufficient clear and convincing evidence to terminate Mother's parental rights based on endangerment, abandonment, and failure to complete her family service plan.[7] The trial court further found that termination of Mother's parental rights would be in the child's best interest.[8] Finally, the trial court appointed DFPS as the child's sole managing conservator.[9]

This appeal followed.

## PROPRIETY OF TERMINATION ORDER

In four issues, Mother contends that the evidence is legally and factually insufficient to support either the predicate findings or the finding that termination is in the child's best interest. In a fifth issue, Mother contends that the trial court abused its discretion in naming DFPS as the child's sole managing conservator.

*Standard of Review and Applicable Law*

A parent's right to "the companionship, care, custody, and management" of her children is a constitutional interest "far more precious than any property right."

---

[7]    *See* TEX. FAM. CODE § 161.001(b)(1)(E), (N), (O).

[8]    *See id.* § 161.001(b)(2).

[9]    *See id.* § 153.131(b) (authorizing appointment of non-parent if "appointment of the parent . . . would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development").

*Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982) (internal quotations omitted). The United States Supreme Court has emphasized that "the interest of [a] parent[] in the care, custody, and control of [her] children . . . is perhaps the oldest of the fundamental liberty interests recognized by th[e] Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). Likewise, the Texas Supreme Court has concluded that this "natural parental right" is "essential," "a basic civil right of man," and "far more precious than property rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (internal quotations omitted). Consequently, "[w]e strictly construe involuntary termination statutes in favor of the parent." *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012).

Because termination of parental rights is "complete, final, irrevocable and divests for all time that natural right . . . , the evidence in support of termination must be clear and convincing before a court may involuntarily terminate a parent's rights." *Holick*, 685 S.W.2d at 20. Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007; *see also In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). Because the standard of proof is "clear and convincing evidence," the Texas Supreme Court has held that the traditional legal and factual standards of review are inadequate. *See In re J.F.C.*, 96 S.W.3d at 264–68.

11

In conducting a legal-sufficiency review in a termination-of-parental-rights case, we must determine whether the evidence, viewed in the light most favorable to the finding, is such that the fact finder could reasonably have formed a firm belief or conviction about the truth of the matter on which DFPS bore the burden of proof. *Id.* at 266. In viewing the evidence in the light most favorable to the finding, we "must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so," and we "should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (internal quotations omitted). But, this does not mean we must disregard all evidence that does not support the finding. *In re J.F.C.*, 96 S.W.3d at 266. Because of the heightened standard, we must also be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id.* If we determine that no reasonable trier of fact could have formed a firm belief or conviction that the matter that must be proven is true, we must hold the evidence to be legally insufficient and render judgment in favor of the parent. *Id.*

In conducting a factual-sufficiency review in a termination-of-parental-rights case, we must determine whether, considering the entire record, including evidence both supporting and contradicting the finding, a fact finder reasonably could have formed a firm conviction or belief about the truth of the matter on which DFPS bore

12

the burden of proof. *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002). We should consider whether the disputed evidence is such that a reasonable fact finder could not have resolved the disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (internal quotations omitted).

To terminate the parent-child relationship, DFPS must establish, by clear and convincing evidence, one or more of the acts or omissions enumerated in Texas Family Code section 161.001(b)(1) and that termination of parental rights is in the best interest of the child. *See* TEX. FAM. CODE § 161.001(b). Both elements must be established, and termination may not be based solely on the best interest of the child as determined by the trier of fact. *Id.*; *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). "Only one predicate finding under section 161.001[(b)](1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

*Endangering Conduct*

Mother argues that the evidence is legally and factually insufficient to support the trial court's finding that she engaged, or knowingly placed the child with person who engaged, in conduct that endangered the child's physical and emotional well-being. Mother acknowledges her many failed drug tests during the pendency of this case and her criminal history of assault and pending charge for making a terroristic threat, but she nevertheless contends that those actions never endangered the child. Specifically, Mother contends that there is no "testimony/evidence regarding any specific act(s) that placed appellant's child in danger because of appellant's drug use and any alleged endangerment" and that "all of [Mother's] alleged drug use . . . occurred only after the child was removed from [Mother's] care." Likewise, Mother argues that all her criminal charges "occurred prior to the child's birth; indeed, there is no evidence of [Mother] committing any additional criminal offenses after the birth of her child."

A trial court may terminate the parent-child relationship if it finds by clear and convincing evidence that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endanger[ed] the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(E). Within this context, endangerment encompasses "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family

14

environment." *Boyd*, 727 S.W.2d at 533. Instead, "endanger" means to expose the child to loss or injury or to jeopardize his emotional or physical health. *See id.* (internal quotations omitted); *see also Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 616 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

We must look at a parent's conduct alone, including her actions and omissions. *In re J.W.*, 152 S.W.3d 200, 205 (Tex. App.—Dallas 2004, pet. denied). It is not necessary to establish that a parent intended to endanger the child. *See In re M.C.*, 917 S.W.2d 268, 270 (Tex. 1996); *In re L.M.N.*, No. 01-18-00413-CV, 2018 WL 5831672, at *14 (Tex. App.—Houston [1st Dist.] Nov. 8, 2018, pet. denied) (mem. op.). But termination of parental rights requires "more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required." *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.); *see also In re L.M.N.*, 2018 WL 5831672, at *14; *In re J.W.*, 152 S.W.3d at 205. The specific danger to the child's well-being may be inferred from parental misconduct, even if the conduct is not directed at the child and the child suffered no actual injury. *See Boyd*, 727 S.W.2d at 533; *In re L.M.N.*, 2018 WL 5831672, at *14; *Walker*, 312 S.W.3d at 616. Courts may consider parental conduct that did not occur in the child's presence, including conduct that occurred after the

child was removed by DFPS. *In re L.M.N.*, 2018 WL 5831672, at \*14; *In re A.A.M.*, 464 S.W.3d 421, 426 (Tex. App.—Houston [1st Dist.] 2015, no pet.

A parent's narcotics use can qualify as a voluntary, deliberate, and conscious course of conduct that endangers the child's well-being. *In re C.V.L.*, 591 S.W.3d 734, 751 (Tex. App.—Dallas 2019, pet. denied); *In re S.R.*, 452 S.W.3d 351, 361–62 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). And, continued narcotics use after the child's removal is conduct that jeopardizes a parent's parental rights and may be considered as establishing an endangering course of conduct. *In re C.V.L.*, 591 S.W.3d at 751; *In re S.R.*, 452 S.W.3d at 361–62; *see also Cervantes-Peterson v. Tex. Dep't of Family & Protective Servs.*, 221 S.W.3d 244, 253 (considering conduct jeopardizing parental rights as part of course of conduct endangering well-being of child). When a parent engages in narcotics use during the pendency of a termination-of-parental-rights case, when she knows she is at risk of losing her children, the evidence is legally sufficient to support a finding of endangerment. *See In re D.D.M.*, No. 01-18-01033-CV, 2019 WL 2939259, at \*4 (Tex. App.—Houston [1st Dist.] July 9, 2019 no pet.) (mem. op.); *see also In re R.S.*, No. 01-20-00126-CV, 2020 WL 4289978, at \*7 (Tex. App.—Houston [1st Dist.] July 28, 2020, no pet.) (mem. op.) ("Parental [narcotics] use remains endangering conduct even if the child was not in the parent's custody when the [narcotics] use occurred."); *In re A.M.*, 495 S.W.3d 573, 580 (Tex. App.—Houston

16

[1st Dist.] 2016, pet. denied) ("Because the evidence showed that the [parent] engaged in illegal [narcotics] use during the pendency of the termination suit, when he knew he was at risk of losing his children, we hold that the evidence is legally sufficient to support a finding of endangerment.").

Here, Mother failed at least five drug tests during the pendency of these proceedings, testing positive for methamphetamines, amphetamines, cocaine, and benzoylecgonine. Thus, viewing the evidence in the light most favorable to the trial court's finding, we conclude that the trial court could have formed a firm belief or conviction that Mother engaged, or knowingly placed the child with persons who engaged, in conduct that endangered the child's physical and emotional well-being. *See* TEX. FAM. CODE § 161.001(b)(1)(E). We hold that the evidence is legally sufficient to support the trial court's finding that Mother engaged, or knowingly placed the child with persons who engaged, in conduct that endangered the child's physical and emotional well-being. *See In re C.V.L.*, 591 S.W.3d at 750–51 (holding evidence legally sufficient to showing endangering-conduct finding when evidence showed parent tested positive twice for narcotics use during pendency of termination-of-parental-rights case); *In re D.D.M.*, 2019 WL 2939259, at \*4 (when "a parent engages in [narcotics] use during the pendency of a [termination-of-parental-rights-case], when he knows he is at risk of losing his children, the evidence is legally sufficient to support a finding of endangerment").

17

Regarding factual sufficiency, we are aware of cases holding that limited evidence of drug use is not factually sufficient evidence to terminate parental rights for endangerment. *See In re C.V.L.*, 591 S.W.3d at 752 (noting, in holding evidence factually insufficient to support trial court's finding of endangerment based on parent's narcotics use, that DFPS was required to show continuing course of conduct to satisfy requirements of Texas Family Code section 161.001(b)(1)(E)); *In re S.K.G.*, No. 13-21-00145-CV, 2021 WL 4897865, at *6–7 (Tex. App.— Corpus Christi Oct. 21, 2021, no pet.) (mem. op.) (holding evidence insufficient to support trial court's finding parent engaged in endangering conduct, when "there was no evidence presented that [the parent] suffered from a [narcotics] abuse problem," only evidence that parent did not follow FSP related to narcotics-use testing); *Ruiz v. Tex. Dep't of Family and Protective Servs.*, 212 S.W.3d 804, 818 (Tex. App.—Houston [1st Dist.] Nov. 2, 2006, no pet.) (mem. op.) (holding evidence insufficient to support trial court's finding that parent engaged in conduct which endangered child's physical or emotional well-being where evidence of parent's narcotics use was "extremely limited" and no evidence showed parent used narcotics while caring for child or when she was in child's presence); *see also In re J.A.*, No. 05-19-01333-CV, 2020 WL 2029248, at *5–6 (Tex. App.—Dallas Apr. 28, 2020, pet. denied) (mem. op.) (holding that evidence parent tested positive for marijuana use three times during pendency of termination case could not serve as

18

"a basis for a factually sufficient finding"); *In re C.A.B.*, 289 S.W.3d 351, 884 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) ("[A] single incident of [narcotics] use while the child is not in the parent's custody does not support an inference of endangerment."); *In re A.S.*, 261 S.W.3d 76, 86–87 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (holding evidence factually insufficient to support trial court's finding that parent consciously engaged in course of conduct that endangered her child's well-being where parent used marijuana on one occasion).

This is a not a case with limited evidence of drug use. Unlike the factually insufficient cases cited above, in this case Mother did not have a single "clean" drug test during the entire court of the termination proceedings—she either tested positive for illegal drugs or she failed to appear for testing. Here, during the pendency of the suit—from March 2021 to December 2021—Mother had five positive tests for illegal drugs, including, methamphetamine, amphetamine, and cocaine.[10]

Viewing the evidence in a neutral light, we conclude that a reasonable factfinder could have formed a firm belief or conviction, based on her *continuing*

---

[10]    During the same period, she failed to take required drug tests on at least 14 occasions, thus, according to the terms of her family service plan, they were presumed positive results. *See In re C.A.B.*, 289 S.W.3d 874, 885 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (holding that factfinder could infer that parent's failure to submit to court-ordered drug screening indicated that she was avoiding testing because of drug-use).

*and persistent* use of illegal drugs, that Mother engaged, or knowingly placed the child with persons who engaged, in conduct that endangered the child's physical and emotional well-being. *In re C.H.*, 89 S.W.3d at 25–26.

We overrule issue one. Having determined that there was legally and factually sufficient evidence to support the termination of Mother's parental rights under section 161.001(b)(1)(E), we need not address issues two and three regarding termination under subsections (N) and (O). *See In re A.V.*, 113 S.W.3d at 362 ("Only one predicate finding under section 161.001[(b)](1) is necessary to support a judgment of termination when there is also a finding that termination is in the child[ren]'s best interest.").

### *Best Interest of the Child*

In her fourth issue, Mother argues that the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights was in the child's best interest. This analysis evaluates the best interest of the child. *See In re M.A.A.*, No. 01-20-00709-CV, 2021 WL 1134308, at *20 (Tex. App.—Houston [1st Dist.] Mar. 25, 2021, no pet.) (mem. op.). We presume that the prompt and permanent placement of the child in a safe environment is in his best interest. *See* TEX. FAM. CODE § 263.307(a); *In re D.S.*, 333 S.W.3d at 383.

There is also a strong presumption that the child's best interest is served by maintaining the parent-child relationship. *In re L.M.*, 104 S.W.3d 642, 647 (Tex.

20

App.—Houston [1st Dist.] 2003, no pet.). Thus, we strictly scrutinize termination proceedings in favor of the parent. *See In re M.A.A.*, 2021 WL 1134308, at *20. Because of the strong presumption in favor of maintaining the parent-child relationship and the due process implications of terminating a parent's rights to her minor children without clear and convincing evidence, "the best interest standard does not permit termination merely because [the] child might be better off living elsewhere." *In re J.G.S.*, 574 S.W.3d 101, 121–22 (Tex. App.—Houston [1st Dist.] 2019, pet. denied) (internal quotations omitted); *see also In re W.C.*, 98 S.W.3d 753, 758 (Tex. App.—Fort Worth 2003, no pet.). Termination of parental rights should not be used as a mechanism to merely reallocate children to better and more prosperous parents. *In re J. G. S.*, 574 S.W.3d at 121–22; *In re W.C.*, 98 S.W.3d at 758.

Moreover, termination is not warranted "without the most solid and substantial reasons." *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976) (internal quotations omitted); *see also In re N.L.D.*, 412 S.W.3d at 822. In termination-of-parental-rights cases, DFPS's burden is not simply to prove that a parent should not have custody of her child; DFPS must meet the heightened burden to prove, by clear and convincing evidence, that the parent should no longer have any relationship with her child whatsoever. *See In re K.N.J.*, 583 S.W.3d 813, 827 (Tex. App.—San Antonio 2019, no pet.); *see also In re J.A.J.*, 243 S.W.3d 611,

21

616–17 (Tex. 2007) (distinguishing proof required for conservatorship decisions versus termination decisions).

In determining whether the termination of Mother's parental rights was in the best interest of the child, we may consider several factors, including: (1) the desires of the child; (2) the current and future physical and emotional needs of the child; (3) the current and future emotional and physical danger to the child; (4) the parental abilities of the parties seeking custody; (5) whether programs are available to assist those parties; (6) plans for the child by the parties seeking custody; (7) the stability of the proposed placement; (8) the parent's acts or omissions that may indicate that the parent-child relationship is not proper; and (9) any excuse for the parent's acts or omissions. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). We may also consider the statutory factors set forth in Texas Family Code section 263.307. *See* TEX. FAM. CODE § 263.307; *In re A.C.*, 560 S.W.3d 624, 631 n.29 (Tex. 2018).

These factors are not exhaustive, and there is no requirement that DFPS prove all factors as a condition precedent to the termination of parental rights. *See In re C.L.C.*, 119 S.W.3d 382, 399 (Tex. App.—Tyler 2003, no pet.) ("[T]he best interest of the child does not require proof of any unique set of factors nor limit proof to any specific factors."). The absence of evidence about some of the factors does not preclude a factfinder from reasonably forming a strong conviction or belief

22

that termination is in the child's best interest. *In re C.H.*, 89 S.W.3d at 27; *In re J. G. S.*, 574 S.W.3d at 122.

Likewise, a lack of evidence on one factor cannot be used as if it were clear and convincing evidence supporting termination of parental rights. *In re J. G. S.*, 574 S.W.3d at 122. In some cases, undisputed evidence of only one factor may be sufficient to support a finding that termination is in the child's best interest, while in other cases, there could be "more complex facts in which paltry evidence relevant to each consideration mentioned in *Holley* would not suffice" to support termination. *In re C.H.*, 89 S.W.3d at 27; *see also In re J. G. S.*, 574 S.W.3d at 122. The presence of scant evidence relevant to each factor will generally not support a finding that termination of parental rights is in the child's best interest. *In re M.A.J.*, 612 S.W.3d 398, 410 (Tex. App.—Houston [1st Dist.] 2020, pet. denied). Our focus is on whether the termination of Mother's parental rights would advance the child's best interest. *See* TEX. FAM. CODE § 161.001(b)(2); *In re J. G. S.*, 574 S.W.3d at 127.

*1. Child's Desires/Plans for the Child*

The child was approximately 17 months old at the time of trial and was too young to express his desires. While there was some evidence that the child and Mother had bonded—Mother testified that they were bonded "because he recognizes me"—the evidence showed that the child had never been under Mother's care

23

because he was removed from her custody at birth. There was also some evidence that, during Mother's visits, she engaged with the child by reading, singing, and watching age-appropriate television shows. However, Mother's time spent with the child was limited. She was incarcerated for the first 6 months of his life. Mother also had no plans to regain custody but wanted the child to remain in the custody of DFPS.

In contrast, the child was bonded with his foster family and Foster Mother testified that they would be interested in adopting him if Mother's parental rights were terminated. Foster Mother testified that she has two older children who get along great with the child, calling him "their baby." Foster Mother testified that the child was "always a happy little baby," and that "he enjoys reading books, playing with [their] dogs, [and] going on walks." When asked whether the child was bonded with her family and whether the family was bonded with him, Foster Mother answered affirmatively. *See In re. S.R.*, 452 S.W.3d at 369 ("When [a child is] too young to express [his] desires, the factfinder may consider whether [the child] has bonded with the foster family, [is] well-cared for by them, and [has] spent minimal time with a parent.").

### 2. Current and Future Physical and Emotional Needs and Current and Future Physical or Emotional Danger

A parent's continued illegal drug use, inability to provide a stable home, and failure to comply with a family service plan support a finding that termination is in

24

the child's best interest. *In re M.R.*, 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.). In this case, there was evidence that Mother was likely facing eviction, had no stable income, wanted DFPS to remain as sole managing conservator, and continued to use illegal drugs during the course of the termination proceeding. Evidence of a parent's continued illegal drug use supports a finding that she poses a present and future risk of physical or emotional danger to the child. *See In re S.N.*, 272 S.W.3d 45, 53 (Tex. App.—Waco 2008, no pet.). The record contains evidence that Mother tested positive for illegal drugs repeatedly during the course of the proceedings. *See In re L.G.R.*, 498 S.W.3d 195, 204 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (holding that parent's illegal drug use supports finding of present and future physical and emotional danger to child); *In re W.J.B.*, No. 01-15-00802-CV, 2016 WL 1267847, at *9 (Tex. App.—Houston [1st Dist.] Mar. 31, 2016, no pet.) (mem. op.) (stating that "evidence of past misconduct . . . can be used to measure a parent's future conduct"). Such evidence is relevant not only to the child's present and future emotional and physical needs and dangers but also to the stability of the parents' home, as contrasted with the stability of the child's foster home. *See In re J.M.*, No. 01-14-00826-CV, 2015 WL 1020316, at *7 (Tex. App.—Houston [1st Dist.] Mar. 5, 2015, no pet.) (mem. op.). A parent's illegal drug use is a condition indicative of instability in the home

environment because it exposes a child to the possibility that the parent may be impaired or imprisoned. *See In re A.M.*, 495 S.W.3d at 579.

In contrast, at the time of trial, the child was in a foster home, and his physical and emotional needs were being met; the foster parents hoped to adopt him if Mother's parental rights were terminated.

*3. Parental Abilities, Plans for Children, and Stability of Proposed Placement*

The record shows that Mother's parental rights had previously been terminated as to four other children based on evidence of neglectful supervision and physical neglect. *See In re T.R.M.*, 14-14-00773-CV, 2015 WL 1062171, at *9 (Tex. App.—Houston [14th Dist.] Mar. 10, 2015, no pet.) (mem. op.) (stating that trial court may consider parent's past performance in evaluating her fitness to provide for child). At the time of trial, Mother had a pending felony indictment for threatening a judge. *See in re J.D.S.*, No. 01-10-00767-CV, 2011 WL 4398554, at *6 (Tex. App.—Houston [1st Dist.] Sept. 22, 2011, no pet.) (stating that parent's potential incarceration may negatively impact a child's living environment and emotional well-being). Mother had never had custody of the child since his birth and had no plans to regain custody. She was not seeking to be made sole managing conservator. Instead, in closing arguments, she requested that DFPS be named sole managing conservator and that she remain as possessory conservator.

*4. Availability of Assistance and Excuse for Parent's Acts or Omissions*

There was evidence that Mother's failure to take some of her drug tests or to attend some of her scheduled meetings with the child was attributable to transportation issues. This, however, would not excuse Mother's positive drug tests, which occurred even after the child had been removed from her care and Mother knew that her parental rights were at stake. *See In re D.G.*, No. 01-20-00720-CV, 2021 WL 1256895, at *7 (Tex. App.—Houston [1st Dist.] Apr. 6, 2021, no pet.) (mem. op.) ("[A] parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, supports a finding that the parent engaged in conduct that endangered the child's physical and emotional well-being.") (quoting *In re M.E.-M.N.*, 342 S.W.3d 254, 263 (Tex. App.—Fort Worth 2011, pet. denied)).

Also, in determining the best interest of the child in proceedings for termination of parental rights, the factfinder may properly consider whether a parent has complied with the court-ordered service plan for reunification of the child. *In re I.L.G.*, 531 S.W.3d 346, 355 (Tex. App.—Houston [14th Dist.] 2017, pet. denied). Mother was also offered several parenting services as a part of her family service plan, including individual counseling, domestic violence classes, a psychological assessment, a psychiatric evaluation, a psychosocial evaluation, parenting classes, anger management and substance abuse assessments, and substance abuse individual

27

counseling and substance above group counseling. However, the case manager testified that "she has only been engaged in substance abuse individual counseling and completed the substance abuse assessment." Mother, however, testified that she had completed some parenting classes. When asked what she would do to prevent a drug relapse, Mother said she would "go to AA meetings and NA meetings," but she admitted that she had not attended an AA or NA meeting in "a few years." Mother's failure to avail herself of the services available is evidence that "casts doubt on her parenting abilities." *See id.* at 356.

Considering the *Holley* factors and the child's "paramount" need for permanence, *see In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.), a reasonable factfinder could have developed a firm belief or conviction that the termination of Mother's rights is in the child's best interest. Accordingly, the evidence is both legally and factually sufficient to support that determination.

We overrule Mother's fourth issue.

### Sole Managing Conservator

In her fifth issue, Mother contends that the trial court erred in appointing DFPS as the child's sole managing conservator. We review conservatorship decisions for an abuse of discretion. *In re J.A.J.*, 243 S.W.3d at 616; *In re J.J.G.*, 540 S.W.3d 44, 55 (Tex. App.—Houston [1st Dist.] 2017, pet. denied). A trial court

28

abuses its discretion if its decision is arbitrary and unreasonable. *In re J.A.J.*, 243 S.W.3d at 616; *In re J.J.G.*, 540 S.W.3d at 55. Thus, in reviewing a trial court's conservatorship decision for an abuse of discretion, we examine whether the court acted without reference to any guiding rules or principles. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *In re J.J.G.*, 540 S.W.3d at 55. A trial court does not abuse its discretion when it bases its decision on conflicting evidence or so long as some evidence of substantive and probative character supports its decision. *In re J.J.G.*, 540 S.W.3d at 55.

The primary consideration in determining issues of conservatorship is always the children's best interest. *See* TEX. FAM. CODE § 153.002. "A managing conservator must be a parent, a competent adult, [DFPS], or a licensed child-placing agency." *See id.* § 153.005(b); *see also In re J.A.J.*, 243 S.W.3d at 614. Texas Family Code section 153.131 creates a rebuttable presumption that the appointment of a parent as managing conservator is in the best interest of the child unless the trial court finds that the appointment of the parent "would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development." *See* TEX. FAM. CODE § 153.131(a), (b).

Unlike the findings necessary to support termination of parental rights, which require clear and convincing evidence, a finding that appointment of a parent as managing conservator would significantly impair the children's physical health

29

or emotional development is governed by a preponderance-of-the-evidence standard. *See In re J.A.J.*, 243 S.W.3d at 616; *see also* TEX. FAM. CODE § 105.005 ("Except as otherwise provided by this title, the court's findings shall be based on a preponderance of the evidence.").

However, because we have overruled Mother's challenge to the portion of the trial court's order terminating her parental rights, the order has divested Mother of her legal rights and duties related to the child. *See* TEX. FAM. CODE § 161.206(b); *In re J.D.G.*, 570 S.W.3d 839, 856 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). Therefore, Mother does not have standing to challenge the portion of the order appointing DFPS as the child's conservator. *J.D.G.*, 570 S.W.3d at 856.

Accordingly, we overrule Mother's fifth issue.

## CONCLUSION

We affirm the trial court's order terminating Mother's parental rights to the minor child, J.H.

Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Landau and Hightower.